UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLOBAL NAPS ILLINOIS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>) Case No. 09-cv-3113<br>ILLINOIS COMMERCE COMMISSION, )<br>) Judge John W. Darrah<br>Defendant, )<br>)<br>and )<br>)<br>ILLINOIS BELL TELEPHONE CO., )<br>)<br>Intervenor-Defendant. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Global NAPs Illinois, Inc. ("Global") filed a seventeen-count "Complaint and

Petition for Review," challenging a ruling of the Illinois Commerce Commission ("ICC")

and naming the ICC as the sole defendant. Illinois Bell Telephone Company

("AT&T Illinois" or "AT&T")[1] was the opposing party in the ICC proceedings. On

August 20, 2009, AT&T Illinois was granted leave to intervene in the instant action.

On February 18, 2010, five of Global's seventeen claims were dismissed as time

barred in response to a motion to dismiss filed by AT&T. On April 12, 2010, all three

parties moved for summary judgment on each of Global's remaining twelve counts.

---

[1] Illinois Bell Telephone Co. currently does business as AT&T Illinois.

# BACKGROUND

Global, a Delaware corporation, is certified to provide telecommunications-related services in Illinois.[2] AT&T Illinois is the incumbent local exchange carrier in Illinois.[3] Global and AT&T Illinois are parties to an Interconnection Agreement (the "ICA") that was negotiated pursuant to the Telecommunications Act of 1996 ("Telecom Act") and approved by the ICC on July 23, 2003.

## The Telecom Act

Until the 1990s, local phone service was monopolistic and regulated by states. The Telecom Act now requires incumbent local exchange carriers (such as AT&T Illinois) to negotiate agreements with other telecommunications carriers, allowing those carriers to connect to the incumbent's network. All local exchange carriers have a duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications," 47 U.S.C. § 251(b)(5), and to negotiate in good faith particular terms and conditions of agreements to fulfill that duty, 47 U.S.C. § 251(c)(1). Incumbent local exchange carriers have additional duties. Among those is a duty to provide

---

[2] Global and the ICC filed statements of fact pursuant to Local Rule 56.1. AT&T did not. All parties (including AT&T) filed responses to their opponents' statements. Much of what is contained in the statements and responses consists of legal argument and competing characterization of purportedly applicable case law. Although the parties have each filed a motion for summary judgment, this is an appeal of an administrative decision. As more fully set out below, review is confined to the administrative record, and no further factual development is considered. Accordingly, all facts are limited to the administrative record as highlighted in the parties' statements of fact and briefs.

[3] "Incumbent local exchange carriers" are carriers that were providing local phone service when the Telecom Act was passed. They are comprised mostly of the "Regional Bell Operating Companies" or "Baby Bells" that were created as a result of a consent decree settling the United States' antitrust suit against AT&T in the early 1980s. AT&T Illinois is an incumbent local exchange carrier.

interconnection with a requesting local exchange carrier's network for transmitting and routing telephone exchange service, as well as access at any technically feasible point within the carrier's network, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and §§ 251 and 252. 47 U.S.C. § 251(c).

Section 252 governs the negotiation, arbitration and approval of interconnection agreements. Upon receiving a request for interconnection under § 251, an incumbent local exchange carrier "may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1). The agreement must include "a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement." *Id.* If the parties are unable to negotiate a complete agreement, the parties may submit the disputed issues to the relevant state commission – the ICC, in this case – for arbitration. 47 U.S.C. § 252(b). The state commission must then resolve the arbitration pursuant to certain standards set forth in § 252. 47 U.S.C. § 252(b). Whether adopted by negotiation or arbitration, an interconnection agreement must ultimately be submitted to the state commission for approval. 47 U.S.C. § 252(e)(1). A party aggrieved by any determination made by a state commission under § 252 may bring an action in a federal district court to determine whether the agreement or statement meets the requirements of §§ 251 and 252. 47 U.S.C. § 252(e)(6). This includes the right to challenge orders issued by state

agencies implementing the Telecom Act. *Ill. Bell Tel. Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566, 570-71 (7th Cir. 1999) (*Worldcom*).

### The ICA

When Global entered the Illinois market in 2001 and began negotiating with AT&T Illinois for an interconnection agreement, Global had only one business: it enabled dial-up internet access offered by third parties to end users.[4] Global interconnected with local telephone companies, such as AT&T Illinois, in order to transmit calls from those companies' subscribers to internet service providers ("ISPs"). Global signed the ICA for the purpose of expanding its dial-up internet-access business. After entering into the ICA, however, Global altered its business model and began contracting with voice-over-internet-protocol ("VoIP") aggregators to receive their traffic and forward it to AT&T Illinois and other local exchange carriers for termination to end users on those networks and the networks of third parties.[5] In other words, Global was delivering some traffic in the reverse form of what it contemplated when it formed the ICA.

Global nonetheless used the existing ICA to deliver traffic to AT&T Illinois. AT&T delivered Global's traffic to AT&T's customers or passed it on to third-party

---

[4] Global has not identified any factual support in the record for its account of its business activities at the time it negotiated the ICA. These purported facts are included for the purpose of context only.

[5] VoIP is an internet application used to transmit a voice communication over a broadband internet connection. Unlike traditional public-switched telephone networks, VoIP communications generally can originate and terminate from any place with a broadband internet connection, including locations not necessarily affiliated with the geographic location associated with the VoIP subscriber's telephone number. Such services are referred to as "nomadic VoIP" services.

4

networks pursuant to the terms of the ICA and billed Global for its services. Global has refused to pay for these services.

## Procedural History

In 2006, AT&T Illinois filed a complaint in this Court, seeking recovery for the following: (1) charges for high-capacity facilities (called "DS3" facilities) connecting AT&T's and Global's networks; (2) transiting charges for traffic that AT&T Illinois delivered to third-party networks; and (3) terminating charges and local access charges for traffic delivered to AT&T's customers.[6] AT&T asserted that all charges were due under the ICA.

On December 17, 2007, this Court dismissed a number of AT&T's claims, holding that the ICC had primary jurisdiction over them. *See Ill. Bell Tel. Co. v. Global NAPs Ill., Inc.*, No. 06 C 3431, 2007 WL 4531790 (N.D. Ill. Dec. 17, 2007). On February 13, 2008, AT&T filed a complaint with the ICC, raising the same issues. Global filed an answer. Discovery was conducted, information was exchanged, and the parties presented written testimony. On September 4, 2008, an evidentiary hearing was held during which testimony of witnesses, including cross-examination, and documentary evidence were admitted. The parties then submitted briefs to the administrative law judge, who later issued a proposed order for the ICC's review. Global and AT&T Illinois each filed exceptions and replies.

---

[6] Generally, "transiting" refers to AT&T's transportation of Global's traffic across AT&T's network to third-party carriers; "termination" refers to AT&T's delivery of Global's traffic to customers within AT&T's own network.

On February 11, 2009, the ICC entered a 63-page written order, resolving all claims in favor of AT&T Illinois and against Global. *See* C2239-2302,[7] *Ill. Bell Tel. Co. v. Global NAPs Ill., Inc.*, Case No. 08-0105 (Order Feb. 11, 2009) ("ICC Order"). Specifically, the ICC found that Global owed AT&T more than $1.5 million in fees under the ICA, based on the following breaches of that agreement: (1) Global's failure to pay for DS3 circuits connecting Global's Oak Brook facility to AT&T's La Grange tandem office; (2) Global's failure to pay for transiting charges; and (3) Global's failure to pay reciprocal compensation and intrastate access charges. *See* ICC Order at 62-63.

On March 11, 2009, the ICC denied Global's motion for a stay of the February 11 Order. Global then sought to submit additional evidence to show that AT&T's proposed charges were unjust, unreasonable, and discriminatory and to reopen the record to allow Global to submit additional evidence to show precisely what percentage of Global's traffic was VoIP traffic. On March 25, 2009, the ICC denied Global's application for rehearing of the February 11 Order and for rehearing to allow submission of additional evidence. On May 22, 2009, Global filed its Complaint and Petition for Review in this case, challenging the ICC Order. On April 12, 2010, all parties moved for summary judgment on the administrative record.

## LEGAL STANDARD

The Seventh Circuit has set forth the appropriate scope of review in cases such as this one where a telecommunications carrier presents a challenge to the ICC's

---

[7] Citations to C_____ are to the consecutively paginated ICC administrative record.

interpretation of a negotiated interconnection agreement. This Court is required "to examine the ICC order, not to determine whether the ICC correctly applied principles of state contract law, but to see whether its decision violates federal law, as set out in the [Telecom] Act or in the FCC's interpretation." *WorldCom*, 179 F.3d at 572. "Section 252(e)(6) authorizes a federal court to determine whether the agency's decision departs from federal law. A decision 'interpreting' an agreement contrary to its terms creates a different kind of problem – one under the law of contracts, and therefore one for which a state forum can supply a remedy." *Id.* at 574.

Judicial review is limited to the administrative record. *See Ill. Bell Tel. Co. v. Box*, No. 05 C 3550, 2007 WL 2815924, at *4 (N.D. Ill. Sept. 21, 2007) ("Because this is an administrative appeal, this Court sits as an appellate tribunal reviewing the decision of the ICC, rather than performing its traditional role as a trial court.") (citations omitted). The ICC's interpretation of federal law is reviewed *de novo. Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 385 (7th Cir. 2004). Factual determinations made by the ICC are reviewed under a deferential, arbitrary-and-capricious standard. *Id.* (citing *Sw. Bell Tel. Co. v. Apple*, 309 F.3d 713, 717-18 (10th Cir. 2002); *US W. Commc'ns, Inc. v. Hamilton*, 223 F.3d 1049, 1052 (9th Cir. 2000)). Under the arbitrary-and-capricious standard of review, "[a]ll a court need do is determine whether the ICC's bottom line is supported by the record." *MPower Commc'ns Corp. v. Ill. Bell Tel. Co.*, 457 F.3d 625, 629 (7th Cir. 2006). A district court may not substitute its own interpretation of the facts for that of the ICC:

> Although we review the entire administrative record, we do not reweigh
> the evidence [or] decide questions of credibility, and are not empowered to

substitute [our] judgment for that of the agency. In other words, a reviewing district court does not sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act.

*Ill. Bell Tel. Co. v. Wright*, No. 00 C 7050, 2003 WL 22757752, at *6 (N.D. Ill. Nov. 20, 2003) (*Wright*) (citations and internal quotation marks omitted).

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## ANALYSIS

Although there are twelve counts remaining in Global's Complaint and Petition for Review, there are really only three issues to be decided: (1) Did the ICC violate federal law or act arbitrarily and capriciously in determining that the ICA required Global to pay for DS3 facilities to connect to AT&T's network? (2) Did the ICC violate federal law or act arbitrarily and capriciously in determining that Global owed AT&T for transiting charges, intrastate access charges, and reciprocal compensation under the ICA? And (3) Did the ICC violate federal law or Global's constitutional right to due process by refusing to reopen the proceedings after issuing its final order?

### DS3 Facilities

The ICC determined that Global was obligated to pay for DS3 facilities used to connect its network to AT&T's. It is undisputed that Global used these facilities to transport traffic between Global's Oak Brook facility and AT&T's La Grange tandem building, that AT&T billed Global for the facilities, and that Global has refused to pay. It

is also undisputed that each party agreed in the ICA to assume responsibility for all expenses on its side of a designated "Point of Interconnection" ("POI"). The only dispute concerns the location of that POI.

The provisions regarding the method and terms of interconnection between AT&T's and Global's networks are contained in Appendix NIM (Network Interconnection Methods) to the final ICA. Section 3.4.7 of that appendix provides four "basic Fiber Meet design options" and expressly provides that "[t]he Parties agree to use the options set forth in 3.4.7.4." That provision, in turn, provides that "[t]he POI will be defined as being at the **SBC-13STATE** location."[8] The ICC considered that provision in the context of other evidence presented in the course of the proceedings before it and stated, "This showing makes clear to the Commission that Global agreed in the final, binding ICA, submitted to and approved by the Commission, that the POI would be at AT&T Illinois' location, not at Global's facility." ICC Order 12. Global argues that the ICC's interpretation of this apparently clear provision is incorrect as a matter of law and fact. None of Global's arguments are persuasive.

Global claims the ICC violated federal law by denying Global's right to choose the POI. The Telecom Act provides that an incumbent local exchange carrier has a duty to provide interconnection within its network to a requesting telecommunications carrier "at any technically feasible point within the [incumbent] carrier's network." 47 U.S.C. § 251(c)(2)(B); see also 47 C.F.R. § 51.305(a)(2). Global argues that it wanted to

---

[8] Illinois Bell Telephone Co. previously did business as SBC Illinois. "SBC-13STATE" is defined in the ICA as "the applicable SBC owned ILEC(s) doing business in Arkansas, California, Connecticut, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas, and Wisconsin." *See* ICA § 1.1.106.

connect at Oak Brook and was denied that choice. By interpreting the ICA as it did, however, the ICC did not prevent Global from choosing a POI. On the contrary, the ICC determined that Global *did* choose a POI – the La Grange tandem building; and there is nothing in the Telecom Act that prevents Global from making that choice. Indeed, the Telecom Act expressly permits carriers to make such a choice through a "binding agreement . . . without regard to the standards" set forth in § 251. 47 U.S.C § 252(a)(1); *see also Pac. Bell v. Pac West Telecomm, Inc.*, 325 F.3d 1114, 1127 (9th Cir. 2003). By arguing that the ICC erred in its interpretation of the ICA, Global merely asserts a state-law issue of contract interpretation, which is outside the relevant scope of review available here. *See Worldcom*, 179 F.3d at 574. Accordingly, the ICC's decision can only be reversed if it is arbitrary and capricious. Global challenges the ICC's findings on several grounds.

First, Global argues that an earlier arbitration decision had already resolved the POI issue in Global's favor. After Global received certification to operate as a competitive local exchange carrier, it began the process of negotiating an interconnection agreement with AT&T Illinois. Pending the resolution of certain issues that were submitted to arbitration, AT&T and Global agreed to connect their networks under the terms of an interim interconnection agreement. When a dispute arose regarding whether Global could select its Oak Brook facility as a POI, the interim agreement was amended to provide that the parties would interconnect via a SONET (synchronous optical network) system using fiber facilities between La Grange and Oak Brook without any immediate charges to Global. The amended agreement further provided that, within

60 days of the final ICA being approved, Global could seek an order from the ICC regarding whether the POI would be located at the Oak Brook location. It also provided that, if no court or agency provided such a ruling within twelve months of the date of interconnection, Global would either provide fibers between Oak Brook and La Grange or pay AT&T Illinois for use of the facilities already in place. Global executed the amendment on May 10, 2002.

It is undisputed that Global did not seek a determination regarding the location of the POI within 60 days after the ICA was approved. It is also undisputed that Global did not provide any fibers between Oak Brook and La Grange within twelve months of interconnection. Therefore, Global now has no choice but to pay for its use of the DS3 facilities.

Global nonetheless asserts that its obligation to seek a separate decision regarding the location of the POI was mooted by the arbitration decision entered four days after Global executed the amendment to the interim agreement. When Global raised this same argument below, the ICC reviewed the arbitration decision and determined that the specific issue submitted to arbitration was whether AT&T could impose transport charges for "long haul" calls within the same LATA (Local Access and Transport Area) if Global selected a single POI, rather than multiple POIs. The ICC sided with Global and determined that Global had a right to choose a single POI and that each party must bear all costs on its side of the POI. Because Global previously had communicated a desire to designate its Oak Brook location as the POI, Global argues that the ICC affirmed that choice when it stated that Global had a right to choose a single POI. As the ICC noted,

however, the arbitration decision did not address the *location* of the POI: "We see not one word in this Commission's arbitration decision that discusses whether the POI may be located at Global's Oak Brook facility – simply because that particular issue was not at hand." ICC Order 12. Based on the record, there is nothing arbitrary and capricious about the ICC's interpretation of its own arbitration decision.

Second, Global argues that the ICC failed to consider the full testimony of one of its witnesses. Jeffrey Noack, Global's Director of Network Operations, testified before the ICC that "Global has its transmission equipment in its facility in Oak Brook, Illinois," and that "Global chose to connect to the Illinois Bell network by connecting at a single point – the Illinois Bell tandem switch in La Grange." C5761. According to AT&T, this testimony actually resolves the POI issue in AT&T's favor. Global notes, however, that Noack further explained that the parties agreed to connect a SONET fiber meet between Oak Brook and La Grange and that AT&T Illinois and Global agreed to share the cost of the SONET. According to Global, this testimony supports its position that the POI was the SONET between the facilities, not AT&T's tandem building.

AT&T, on the other hand, presented evidence showing that the SONET was owned, installed by, and paid for solely by AT&T. The record shows that the ICC considered Global's argument that the SONET served as the POI and rejected that argument. It is not the task of this Court to substitute its judgment for that of the ICC in weighing conflicting evidence. *Wright*, 2003 22757752, at *6. The ICC did not act arbitrarily and capriciously by not treating Noack's characterization of his company's agreement as dispositive in the face of contrary evidence.

Third, in an argument buried in a footnote in its motion for summary judgment, Global argues that because some of AT&T's equipment was physically located at Global's Oak Brook facility, it is reasonable to interpret "SBC-13STATE location" (i.e., AT&T's location) to mean Oak Brook. *See* Docket No. 55 at 12 n.40. This argument is directly contrary to the ICC's factual finding that the "SBC-13STATE location" refers to the La Grange tandem building; and Global has not identified any evidence that would support its contrary interpretation, much less enough evidence to render the ICC's finding arbitrary and capricious. As stated by the ICC: "[W]hether interconnecting at Global's Oak Brook facility is theoretically 'feasible' today (or yesterday) is wholly beside the point, because the binding ICA says the POI is at AT&T Illinois' location, and Global never sought a ruling from the Commission as to whether it could instead designate its Oak Brook facility as the POI." ICC Order 13.

Fourth, Global argues that AT&T slipped the POI choice past Global in the final ICA, arguing, "What the ICC found, at most, was that Global never enforced its choice of POI, and that AT&T put the provision selecting La Grange into the ICA it drafted, which should have been construed against [AT&T] in the first place." Docket No. 61 at 12. To the extent this argument for disregarding the plain language of a negotiated and executed contract has any merit, it merely presents an issue of state law that is beyond the applicable scope of review here.

The ICC considered the ICA, the interim interconnection agreement, the amendment to that agreement, and relevant testimony from Global's and AT&T's witnesses. Although Global *could have* chosen Oak Brook – an issue that is by no means

clear – does not mean that it did; and because the ICC determined that Global did not

choose Oak Brook does not mean the ICC *deprived* Global of its right to choose. "If the

arrangements were not to Global's liking, it has only itself to blame." ICC Order 13.

The ICC's finding that Global agreed to designate the La Grange tandem building as the

POI is supported by the record. Accordingly, summary judgment on Count 1 (claiming

the ICC deprived Global of its right to select a POI) is granted in favor of the ICC and

AT&T Illinois and against Global.

### *Reciprocal Compensation, Intrastate Access Charges, and Transiting Charges*

There are three types of charges at issue regarding AT&T's routing of the traffic

delivered to it by Global: (1) reciprocal compensation charges (for terminating local calls

on AT&T's network); (2) intrastate access charges (for terminating intraLATA (i.e.,

regional) calls on AT&T's network); and (3) transiting charges (for transiting Global's

traffic across AT&T's network to the networks of third parties).

Pursuant to the terms of the ICA, Global established local/intraLATA toll trunks[9]

with AT&T and delivered traffic over those trunks. AT&T terminated that traffic to its

end users or passed it on to the networks of third parties and compared the calling party's

number to the receiving party's number to determine whether each call should be

classified as local, intraLATA, or interLATA (i.e., long distance) for purposes of billing.

The ICC found that the ICA required Global to pay these charges:

> [T]he parties' ICA contemplates that the parties will use the Calling Party
> Numbers of the traffic . . . to determine whether, for compensation

---

[9] Trunks are physical connections used to transmit a single call between two
switches on or between networks.

> purposes, the traffic is local (so that local compensation charges apply), intraLATA toll (so that intrastate access charges apply), or interstate (so that interstate access charges apply). . . . According to the telephone numbers, much of the traffic that Global handed off to AT&T Illinois and that AT&T Illinois terminated for Global was local traffic, and much was intraLATA toll traffic. Thus, under the ICA, AT&T Illinois is entitled to charge local reciprocal compensation and tariffed intrastate access charges for terminating this traffic.

ICC Order 46.

Global does not dispute that AT&T terminated Global's calls on its network and transited Global's traffic across its network to third parties; nor does Global dispute that it utilized the ICA to deliver that traffic to AT&T. Global also admits that AT&T billed Global for these services and that Global has not paid the invoices. Global's refusal to pay is based primarily on its argument that the traffic it passed on to AT&T was VoIP traffic or traffic involving an "enhanced service," which Global contends is exempted by the FCC from traditional charges. The ICC rejected this argument for a number of reasons.

First, the ICC determined that Global failed to establish that the traffic it passed on to AT&T was, in fact, VoIP – a determination that can only be overturned if it was arbitrary and capricious. Global presented testimony of two witnesses in the ICC proceedings: Jeffrey Noack and James Scheltema, Global's Vice President of Regulatory Affairs. Both witnesses asserted that the traffic Global passed on to AT&T Illinois came to Global as VoIP traffic from enhanced service providers ("ESPs"). Noack also testified that Global's traffic was "packet switched" (meaning it was in an internet-protocol format) and that Global only converted its VoIP traffic to traditional time division multiplexing ("TDM") traffic to accommodate AT&T's technical demands.

15

Additionally, Scheltema presented two letters written by attorneys for customers of Global's affiliates, stating that the traffic they delivered to Global's affiliates was VoIP traffic.

The ICC treated Scheltema's letters as unreliable hearsay and chose not to consider them. The ICC also noted Noack's admission on cross-examination that Global had no way of knowing the originating format of the calls it received from its customers. In other words, Noack could not determine whether the calls originated as VoIP or whether the callers had picked up a regular phone and dialed 1 plus an area code.

AT&T, on the other hand, presented the results of studies where the calls delivered to AT&T by Global were compared to the originating records for regular long-distance calls that originated on the networks of AT&T's affiliates in twelve states. For each day that data was collected, AT&T found hundreds or thousands of matches. These studies supported AT&T's assertion that some of the traffic delivered by Global originated on a touch-tone network, as opposed to a VoIP service.

As stated in a case Global cites in its Complaint and Petition, the distinction between calls that originate as VoIP and those that originate on a touch-tone network before being converted to VoIP is significant. In *Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Servs. are Exempt from Access Charges*, 19 F.C.C.R. 7457, 7472 (2004), the FCC determined that a service that took traditional touch-tone telephone calls, converted them to packet-switched VoIP, and then converted them back to traditional touch-tone calls was *not* exempt from access charges applicable to traditional TDM calls.

16

Because Global was claiming an exemption from the standard charges for which it was invoiced, the ICC treated Global's claimed exemption as an affirmative defense for which Global had the burden of proof. The ICC then weighed the evidence submitted by both Global and AT&T and concluded that "Global has not brought sufficient credible evidence to support is own claims" and that, at any rate, these claims "fail in the face of other objective evidence on the record." ICC Order 45. The ICC's factual determination regarding the nature of Global's traffic had support in the record and is not arbitrary and capricious.

More importantly, the ICC correctly determined that, even if Global's traffic was VoIP, federal law does not obviate Global's obligation to pay the charges it had expressly agreed to pay under the terms of the negotiated ICA. In arguing that its traffic was exempt from traditional charges under federal law, Global relies on the FCC's decision in *Vonage Holdings Corp.*, 19 F.C.C.R. 22,404 (2004) (*Vonage*)). *Vonage* held that VoIP traffic is jurisdictionally interstate and, thus, not subject to regulation by state utility commissions, preempting an order of the Minnesota Public Utilities Commission that determined that Vonage was a telephone company and thereby subject it to traditional state regulatory requirements. *Id.* at 22,404, 22,408-09.

In an effort to bring its claims within the holding of *Vonage*, Global characterizes the ICC Order as a regulation by a state commission. It is not. *Vonage* did not, as here, address a state commission's order interpreting a negotiated interconnection agreement. Nor does *Vonage* hold that a state commission is prohibited from reading such an agreement and determining that a local exchange carrier agreed to pay local and

intraLATA rates for VoIP traffic it passes on to another carrier. Indeed, the FCC specifically emphasized that the *Vonage* order did not address "intercarrier compensation" or "section 251 rights and obligations." *Id.* at 22,432.

Global also cites a number of cases decided since *Vonage* that purportedly bolster Global's claim that VoIP traffic is not subject to traditional charges. However, like *Vonage*, none of those cases involve the interpretation of a negotiated interconnection agreement. Nor do any of those cases hold that federal law prohibits a state commission from interpreting an existing ICA to apply to VoIP traffic.

For example, Global repeatedly cites to *Manhattan Telecommunications Corp. v. Global NAPs, Inc.*, No. 08 Civ. 3829, 2010 WL 1326095 (S.D.N.Y. Mar. 31, 2010) (*MetTel*). In that case, the plaintiff telephone-service provider sued Global's affiliate[10] to recover expenses for terminating traffic originating with Global's customers and passed on to the plaintiff through a third-party carrier. *Id.* at *1. Although Global had a negotiated interconnection agreement with the third-party carrier, it did not have one with the plaintiff. *Id.* Accordingly, the plaintiff's claims were based only on its filed tariff rates and a theory of unjust enrichment. *Id.* After observing that the FCC has thus far refused to decide whether VoIP services should be classified as telecommunications service or information services and noting "a host of conflicting court and state regulatory rulings" on the issue, the *MetTel* court "decline[d] to enter the melee and attempt to apply the filed rate doctrine to the facts of [that] case" based on Global's showing that a significant percentage of its calls were VoIP. *Id.* at *2. In other words,

_____

[10] For convenience, that affiliate is also referred to as "Global."

18

the court declined to apply general tariff rates to VoIP calls in the absence of an agreement between the originating and terminating carriers. *MetTel* did not hold that VoIP calls could not be subject to charges under the terms of a negotiated interconnection agreement. Summary judgment was awarded in favor of the plaintiff carrier on its theory of unjust enrichment. *Id.* at *3.

Ultimately, neither the Telecom Act nor any FCC decision of which this Court is aware prohibits a competitive local exchange carrier from paying another carrier to transit and terminate VoIP traffic and charge for that service under terms negotiated in an interconnection agreement. Indeed, Global's argument that *Vonage* preempts a state commission from addressing compensation for VoIP traffic in the context of interconnection agreements has been rejected by at least one other district court. *See Global NAPs Cal., Inc. v. Pub. Util. Comm'n of Cal.*, No. CV 09-1927, slip op. at 9-12 (C.D. Cal. Apr. 27, 2010) (*Global NAPs California*).[11] The ICC did not err in deciding that *Vonage* did not preempt its authority to determine that Global owes AT&T under the express terms of their negotiated ICA.

Global also claims the traffic it passed on to AT&T qualified as an "enhanced service" that has been exempted from traditional access charges by the FCC in *MTS & WATS Market Structure*, 97 F.C.C.2d 682 (1983) (*MTS/WATS*). Global again

_____

[11] In fact, *Global NAPs California*, as well as another case between the same parties in that district, No. CV 07-4801, slip op. (C.D. Cal. Dec. 23, 2008), rejected many of the same arguments Global puts forth in the instant case. Although Global is quick to dismiss those cases as not binding on this Court, it repeatedly relies on the decisions from other district courts and proposed rulemaking decisions of the FCC. Global even goes so far as to suggest that the factual findings of judges in other district courts should be conclusive as to the factual issues in this case. *None* of those decisions are binding on this Court; they are only considered for the persuasiveness of their reasoning.

mischaracterizes the authority on which it relies. First, *MTS/WATS* only applies to "ESP

*providers*." *MTS/WATS*, 97 F.C.C.2d ¶ 83 (emphasis added). Global does not claim to

be an ESP provider; it claims to be a provider of wholesale interconnection services, and

it admits that it does not provide service (enhanced or otherwise) to end-user customers

of its own. Thus, the "ESP exemption," as it has become known, does not apply to

Global. Second, the ESP exemption merely exempts ESP providers from *interstate*

access charges, which are not at issue in this case. Third, the exemption applies only to

*ISP-bound* traffic. The traffic between Global and AT&T Illinois is not ISP bound; it is

bound for call recipients on AT&T's switched network. As the ICC observed, Global is

unable to point to any ruling in which the FCC exempted ESP traffic that is terminated on

a switched network from access charges; and Global has presented no authority to

support its assertion that ESP providers are exempt from paying intrastate access charges,

reciprocal compensation charges, or transiting fees. *See* ICC Order 44. Accordingly, the

ICC's decision did not run afoul of the FCC's ESP exemption.

  The ICC also concluded that the issue of whether Global's traffic could be

classified as VoIP was ultimately irrelevant because Global had agreed to pay the charges

in dispute regardless of the originating format of the traffic passed on to AT&T.

Global argues that the ICC's decision was erroneous because VoIP was expressly

excluded from the ICA's terms. The provision on which Global relies states as follows:

> The Parties reserve the right to raise the appropriate treatment of Voice
> Over Internet Protocol (VOIP) or other Internet Telephony traffic under
> the Dispute Resolution provisions of this Interconnection Agreement. The
> Parties further agree that this Appendix shall not be construed against
> either Party as a "meeting of the minds" that VOIP or Internet Telephony
> traffic is or is not local traffic subject to reciprocal compensation. By

> entering into this Appendix, both Parties reserve the right to advocate their respective positions before state or federal commissions whether in bilateral complaint dockets, arbitrations under section 252 of the Act, commission established rulemaking dockets, or in any legal challenges stemming from such proceedings.

ICA Appx. Reciprocal Compensation § 16.9.

Global's reliance on this provision is problematic for several reasons. First, despite Global's assertion that the ICC ignored this "most substantial evidence" in the proceedings below, Docket No. 66 at 7-8, Global never brought this provision to the ICC's attention. Indeed, Global admits the clause was "not discussed by either party or the ICC." Docket No. 55 at 7. Thus, the argument is waived. *See, e.g., Toledo, Peoria & W. Ry. v. Surface Transp. Bd.*, 462 F.3d 734, 736 n.16 (7th Cir. 2006) ("[A]rguments not made before the administrative agency are subsequently waived before the courts.") (citation and internal quotation marks omitted). Second, even if the argument had not been waived, the provision merely provides that Global reserved the right to argue its position that VoIP traffic is not local traffic subject to reciprocal compensation. That right was not infringed: Global's argument was presented to the ICC and rejected in a factually-supported and well-reasoned opinion.

Global similarly relies on section 3.6 of the ICA's Appendix Reciprocal Compensation, which states that the compensation arrangements set forth in the appendix on reciprocal compensation do not apply to "Information Service Traffic." Global claims that all of its traffic was VoIP, that all VoIP is "information service traffic," and that all "information service traffic" is exempt from reciprocal compensation. Again, because there is no evidence that this argument was presented to the ICC or that this specific

21

provision was even discussed, it is waived. Furthermore, there is no indication that Global provides "information services" as opposed to "telecommunications services." As explained above, the ICC specifically found that Global failed to prove its traffic was VoIP traffic.

Moreover, classification of Global's purported VoIP as an "information service" would not obviate Global's duty to pay all of AT&T's invoices. In this regard, Global's reliance on *Southwestern Bell Telephone v. Missouri Public Service Commission*, 461 F. Supp. 2d 1055 (E.D. Mo. 2006) (*Southwestern Bell*), is misplaced. Global quotes *Southwestern Bell* as stating that "IP-PSTN [i.e., IP-enabled traffic that is converted to switched-network traffic] is . . . exempt from access charges under long standing FCC precedent." Docket No. 66 (quoting *Southwestern Bell*, 461 F. Supp. 2d at 1073). Global omitted critical portions of the quoted sentence. When the omitted language is included, the statement reads as follows: "IP-PSTN traffic *is eligible for reciprocal compensation under the Act*, and is exempt from access charges under longstanding FCC precedent *which insulates providers of 'enhanced services' from the access charges that would apply to carriers providing basic long distance service.*" *Southwestern Bell*, 461 F. Supp. 2d at 1073 (emphasis added). The court upheld a state commission's decision that a VoIP provider owed reciprocal compensation (as opposed to long-distance access tariffs) to the incumbent local exchange carrier and specifically noted that "federal law does not exempt IP-PSTN traffic from reciprocal compensation obligations." *Id.* at 1079. Here, AT&T is not seeking recovery of interstate access charges; it seeks recovery for

reciprocal compensation. Therefore, *Southwestern Bell*, which holds that such charges *are* recoverable, simply does not support Global's position.

Ultimately, Global has failed to show that the ICC violated any federal law in deciding that Global was required to pay transiting fees, intraLATA access tolls, and reciprocal compensation for the traffic it handed off to AT&T under the terms of the parties' negotiated ICA. Nor has Global shown that the ICC acted arbitrarily and capriciously in reaching any of its decisions after full consideration of the available evidence and the legal arguments submitted by both parties. To the extent Global otherwise argues that the ICC incorrectly interpreted the ICA, those arguments are beyond the scope of review. *See Worldcom*, 179 F.3d at 574.

Accordingly, the ICC and AT&T Illinois are entitled to summary judgment on the following counts: Counts 2-4 (claiming the ICC violated federal law in holding that Global's traffic was subject to access charges, transiting fees, and reciprocal compensation, respectively); Count 5 (claiming the ICC "imposed" traditional access charges on a wholesale provider of VoIP interconnection services in contravention of federal law); Counts 7-9 (claiming the ICC's order regarding Global's obligation to pay access charges, transiting fees, and reciprocal compensation was not supported by substantial evidence); Count 10 (claiming the ICC's determination that Global was not a VoIP carrier was not supported by substantial evidence); and Count 11 (claiming the ICC's interpretation of the ICA was arbitrary and capricious).

*The ICC's Decision Not to Reopen the Proceedings*

In Counts 6 and 12, Global claims the ICC violated federal law and due process when the ICC refused to reopen the record to allow Global to present evidence of other carriers' interconnection agreements and additional evidence supporting its claim that its traffic was VoIP. Global contends the ICC was aware of this "crucial proof" but refused to reopen the record to allow Global to submit it. Compl. ¶ 71. Global's claims fail for several reasons.

First, Global has not identified any provision of federal law that would require the ICC to reopen its proceedings to consider evidence that was available to Global before those proceedings closed. Indeed, the ICC's hearing procedures are governed by Illinois administrative law. *See* 83 Ill. Admin. Code § 200. As previously decided by this Court, Global forfeited its right to challenge the ICC's decisions under state law when it failed to bring its claims for review within the required time. *See Global NAPs Ill., Inc. v. Ill. Commerce Comm'n*, No. 09-cv-3113, 2010 WL 610606, at *6-8 (N.D. Ill. Feb. 18, 2010).

Second, Global's right to due process was not violated. The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives "any person of life, liberty, or property" without due process of the law. U.S. Const. amend. XIV, § 1. "[T]his language calls for two separate showings to establish a procedural due process claim: i) deprivation of a constitutionally protected liberty or property interest, and ii) denial of adequate procedural protections." *Wright*, 2003 WL 22757752, at *15 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Here, Global fails to show – or

24

even mention – any protectable property interest of which it was deprived by the ICC's decision not to reopen the record.

Nor has Global shown any denial of adequate procedural protections. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). After AT&T brought its original claim under the ICA in this Court, Global successfully moved to dismiss AT&T's claim on the grounds that AT&T was required first to litigate its claims before the ICC. *See Ill. Bell Tel. Co., Inc. v. Global NAPs Ill., Inc.*, No. 06 C 3431, 2007 WL 4531790 (N.D. Ill. Dec. 17, 2007). AT&T then petitioned the ICC; and Global had a full and fair opportunity to respond to the petition, engage in discovery, present testimony, and submit legal arguments. After the ICC issued an order that was decidedly unfavorable to Global, Global submitted an application for rehearing, arguing it should be allowed to present additional evidence that AT&T's charges to Global are discriminatory, unjust, and unreasonable. The ICC fully considered Global's arguments and issued a nine-page written order, explaining its denial of Global's application. *See Ill. Bell Tel. Co.*, Case No. 08-0105 (Recommendation Mar. 25, 2009), http://www.icc.illinois.gov/downloads/public/edocket/240263.pdf. The administrative law judge's recommendation – which was adopted by the ICC – indicated that Global had shown no reason why this information was not presented earlier:

> During this lengthy proceeding, Global Illinois had sufficient time and ample opportunity to develop its theory of the case, to present competent evidence in support, and to offer alternatives to the Commission. The Application appears to recognize that Global Illinois came up short in

several respects and it now wants what amounts to a second chance. The question for this Commission is whether the goals of integrity, fairness, expedition and cost-effectiveness outweigh giving Global yet another opportunity to do what it could well have done at the start. My answer and recommendation is to deny rehearing.

*Id.* at 8-9.

The ICC's refusal to give Global another bite at the apple did not violate due process. *See McPherson v. McBride*, 188 F.3d 784, 786-87 (7th Cir. 1999) (finding that petitioner, who was afforded a hearing with procedural protections, "cannot now demand a new hearing based upon evidence that was available to him at that prior hearing," and that "[d]ue process . . . does not include a right to submit further evidence on appeal.").

The ICC's denial of Global's petition for rehearing violated neither federal law nor due process. AT&T and the ICC are entitled to summary judgment on Counts 6 and 12.

## CONCLUSION

For the reasons discussed above, AT&T's Motion for Summary Judgment and the ICC's Motion for Summary Judgment are both granted in their entirety. Global's Motion for Summary Judgment is denied.

Date: October 21, 2010

JOHN W. DARRAH
United States District Court Judge